UNITY VENTURES, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District   No. 84—210

Opinion filed April 9, 1985.

Roy M. Harsch, Richard J. Kissel, Frederick L. Moore, and Carol L. Dorge, all of Martin, Craig, Chester & Sonnenschein, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (James C. Siebert and Kathleen Smith, Assistant Attorneys General, of Chicago, of counsel), for respondent Environmental Protection Agency.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, of counsel), for respondent County of Du Page.

JUSTICE SCHNAKE delivered the opinion of the court:

Unity Ventures (Unity), a partnership engaged in the development of certain real estate in Du Page County for residential purposes, has petitioned this court under Supreme Court Rule 335 (87 Ill. 2d R. 335) and section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1041) for direct review of an order of the Pollution Control Board (the Board) denying Unity's request for a variance from the Board's Rule 963(a), which limits the duration of sewer con-

struction permits to two years. Unity contends that the Board's decision was contrary to the manifest weight of the evidence, and that the Board erred by imposing certain sanctions on Unity for violation of prehearing discovery rules. The Illinois Environmental Protection Agency (the Agency) and the County of Du Page (the county) have moved this court to dismiss Unity's petition for review on grounds of mootness. These motions have been taken with the case.

On January 31, 1979, the Agency issued a joint sewer construction and operating permit for one of Unity's residential real estate developments known as Hobson Greene Unit Two. Unity Ventures was the "permittee to construct," and the Du Page County Department of Public Works (DCDPW) was the "permitee to own and operate." Pursuant to Rule 963(a) the permit included as a condition that "construction must be completed in *** two years."

On September 29, 1980, or about 1½ years after the permit was issued, Unity filed with the Board a petition for a variance from the two-year construction requirement. The petition alleged that Unity began to develop its Hobson Greene project in 1973. The project was to be developed in three phases. The second phase, Hobson Greene Unit Two, which is the subject of this proceeding, was to be located on 59 acres of land bordered by Greene Road on the east and by 75th Street on the south. It was to include 78 single-family homes and 22 multiple-family residences. Unit Two would generate sewage in the amount of 239,200 gallons per day design average flow (GPDDAF) or 2,392 population equivalents (PE). The first phase, Unit One, was to be located on a 33-acre tract of land immediately north of Unit Two on Greene Road. It was to include 35 single-family homes and would generate sewage in the amount of 14,000 GPDDAF or 140 PE. The third phase, Unit Three, was to be located on a 51-acre tract of land bordered by Greene Road on the east and 75th Street on the north. It was to consist of 121 single-family homes and "480 [sic] multiple family dwelling units" and would generate sewage in the amount of 168,400 GPDDAF or 1,684 PE. Sanitary sewer service to the Hobson Greene project was to be provided by sewer extensions ultimately tributary to the DCDPW's Lisle and Woodridge sewage treatment plants.

According to the variance petition, on February 8, 1979, Unity and DCDPW were issued a joint permit, similar to the one at issue here, to construct and operate a sewer extension to service Unit One. By the date the variance petition was filed, Unity had completed construction of that sewer extension and all improvements necessary to service Unit One. Unity had not, however, begun construction of the

sewer extension to Unit Two pursuant to the permit involved here. According to the variance petition, there were two reasons for Unity's decision not to proceed. One was that there had been a substantial decrease in demand for housing as a result of increased home mortgage rates and a general downturn in the economy. The other reason involved "uncertainties" regarding the Lisle and Woodridge sewage treatment plants, which had been placed on restricted status by the Agency because they were not providing adequate sewage treatment.

The variance petition alleged that Unity had a legal right to construct and connect the sewer extension to Unit Two so long as construction was completed by January 30, 1981, because the two-year construction and operating permit was obtained before the Lisle and Woodridge sewage treatment plants were placed on restricted status. The petition also alleged that Unity would be able to complete construction by that deadline, but that to do so would require substantial expenditures for overtime labor.

According to the petition, Unity would not have begun the Hobson Greene project if it was unable to develop Units One and Two "along a parallel timeframe." The petition stated:

> "To date, Unity has expended the following amounts of money with respect to Hobson Greene Units 1 and 2:

| | |
|---|---|
| Land Development Costs | $270,990.78 |
| Land Improvement Costs | 224,766.23 |
| Interest and Real Estate Tax | 1,338,856.45 |
| Total Costs Incurred | |
| Exclusive of Raw Land Cost | $1,834,613.46." |

Finally, the petition alleged that the variance requested would have no adverse environmental impact. Unity sought a construction time limitation of three to five years from the date of the Board's ruling.

On October 30, 1980, the Board, by a 3-2 vote, entered an order dismissing the variance petition on the ground that the pleading of hardship was insufficient. On December 19, 1980, the Board granted Unity's motion for reconsideration, but, again by a vote of 3-2, reinstated its order dismissing the petition.

Unity petitioned this court for review, and, in an order entered under Supreme Court Rule 23 (73 Ill. 2d R. 23) filed February 2, 1982, this court reversed the order of the Board dismissing the petition, and remanded the cause for a hearing.

On remand the Agency filed on June 4, 1982, a motion for an or-

der requiring Unity to disclose certain information about the organization of its business. The motion noted that in the affidavit verifying its variance petition, Unity was represented as being a partnership. A copy of Unity's partnership agreement, obtained by the Agency in a related lawsuit in the circuit court of Du Page County, showed that it was entered into on June 1, 1979. The permit for which Unity was seeking an extension of time was, however, issued four months earlier. In a deposition taken in the related lawsuit, William A. Alter, one of Unity's partners, testified that he assumed the permit was issued to the corporation known as Unity Ventures. The Agency alleged that said corporation withdrew from doing business in Illinois three weeks after the partnership was formed. The permit included as one of its conditions that it "may not be assigned or transferred without a new permit from the Illinois Environmental Protection Agency." According to the Agency's records, there had been no transfer of the permit. The Agency's motion requested that Unity be ordered to provide additional information "concerning the original permittee, the present holder of the permit and the legal authority under which the permit may be extended for and transferred to the partnership."

On June 11, 1982, the Agency served Unity with a request for admission of facts. The 40 facts set forth related to the history of Unity's business organization as it related to acquisition of the permit; the extent of expenditures on the part of Unity, the partnership, related to the Hobson Greene project; ownership of the real estate involved; the extent of preparations on the part of Unity, the partnership, to begin construction of Unit Two; and the density of dwelling units permitted on Unit Two under a judgment order entered by the circuit court of Du Page County in case No. 75—1128—6. The Agency stated in its request for admission of facts that under Board rules failure to respond within 20 days might cause the facts to stand admitted.

Also on June 11 the Agency served Unity with 40 interrogatories which dealt with the same subjects, as well as the extent of expenditures by Unity, the corporation, and by William A. Alter, individually and doing business as Unity, related to the Hobson Greene project. The interrogatories inquired also into the basis for an assertion in Unity's variance petition that the estimated cost to carry Unit Two would be $175,000 per year until development.

Finally, on the same date that the above discovery requests were served, the Agency served Unity with a request for production of documents concerning the subjects set forth above. The request also sought Federal income tax returns as well as financial statements of

Unity, the partnership; Unity, the corporation; and William A. Alter, doing business as Unity. The Agency requested Unity to respond to its interrogatories and requests to produce in 14 days or by June 25, 1982.

On June 16, 1982, Unity filed a motion requesting an extension of time to respond to the discovery requests to July 1, 1982. The record does not disclose whether this motion was ever ruled on.

On July 1, 1982, the Board denied the Agency's motion for an order requiring Unity to provide information about the history of its business organization because "normal discovery methods will provide the information requested."

On August 5, 1982, a prehearing conference was held before Hearing Officer Robert Hurwitz. He granted Unity's oral motion for an extension of time to respond to the Agency's discovery requests to August 10, 1982.

On the latter date Unity filed its response to the request for admission of facts. Of the 40 requests, 22 were objected to and the others resulted in admissions or denials. On the same date Unity filed its third motion for an extension of time to respond to the remaining discovery requests. This time an extension was sought until August 31, 1982. In its motion Unity stated that it was "in the process of responding" to the interrogatories and request for production of documents. The hearing officer granted the motion.

The Agency subsequently filed a motion to strike Unity's response to the Agency's request for admission of facts. The Board denied this motion in part and referred the remaining part to the hearing officer.

On August 25, 1982, Unity made an oral motion to the hearing officer for a fourth extension of time to respond to the outstanding discovery requests. The extension of time was granted to September 17, 1982.

On September 16, 1982, Unity filed its fifth motion for an extension of time to respond to the outstanding discovery requests. This motion stated as its grounds that Unity was about to file a "major lawsuit" relating to the subject matter of the variance petition. The motion stated that Unity's counsel was in the process of evaluating the impact of the lawsuit on the variance proceeding. An indefinite stay of discovery was sought, conditioned on Unity's reporting to the hearing officer by October 1, 1982, on the effect of the major lawsuit on the variance proceeding.

On October 5, 1982, the Board entered an order which, among other things, noted that Unity had yet to respond to the interrogatories and request for production of documents. Unity was ordered to

respond by October 12, 1982. On that date Unity filed a motion to strike the interrogatories on the grounds that they were "objectionable, oppressive and unduly burdensome in number," and that the Agency had unspecified "alternative means of obtaining the information sought." Unity filed also a motion to strike the request for production of documents on the same bases, and because the documents sought were "neither relevant [nor] likely to lead to any relevant material." The Agency followed with a motion to compel discovery and a request for sanctions. The Agency also filed a motion for an order overruling certain of Unity's objections to the Agency's request for admission of facts.

On November 12, 1982, the Board entered an order denying Unity's motions to strike the interrogatories and request for production, and requiring Unity to respond by November 19, 1982. The order provided that if Unity failed to do so, the Board would impose sanctions. The Board also overruled certain of Unity's objections to the Agency's request for admission of facts, and ordered Unity to admit or deny those facts by November 19, 1982. Unity did not receive its copy of this order until November 18, 1982.

On November 24, 1982, the Agency filed a motion for sanctions based on Unity's failure to respond to the discovery requests. On December 1, 1982, Unity filed a response in opposition to the motion, as well as a motion for reconsideration of the Board's order of November 12, or, in the alternative, for yet another extension of time to respond to outstanding discovery requests.

On December 2, 1982, the Board entered an order finding Unity's actions "intentionally dilatorious," and imposing sanctions for its failure to respond to discovery. The order struck from the variance petition all allegations concerning ownership of the real estate, expenditures for development of the Hobson Greene project, ownership of the permit, and plans for development. Unity was forbidden from raising any issues involving the above matters at the hearing.

Unity subsequently filed a motion for reconsideration of the order imposing sanctions, and to amend its variance petition so that it sought only a two-year period for completion of construction, rather than three to five years, said two-year period to commence upon completion of a new sewage treatment plant then under construction or on January 1, 1984, whichever came first. The Board denied Unity's motion for reconsideration of the order imposing sanctions, but allowed Unity to amend its petition.

Unity filed its amended petition on January 17, 1983. In addition to the amendment in the prayer for relief noted above, the petition

was amended to include allegations about the construction of the new sewage treatment plant, the Greene Valley plant, by Du Page County, and the villages of Lisle and Woodridge. The new plant was going to treat a significant portion of the sewage then being treated by the Lisle and Woodridge facilities which had been placed on restricted status. The Greene Valley plant was scheduled to be completed in August of 1983.

Pursuant to section 37 of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1037), the Agency subsequently filed its recommendation, which was that the variance petition be denied.

The petition proceeded to a hearing on June 30, 1983. In the meantime there had been numerous motions filed by both Unity and the Agency regarding the discovery sanctions, but they remained in effect. At the hearing only one witness testified, James Huff, a consulting engineer. Huff testified on behalf of Unity. He stated that he had reviewed the plans for the sewage treatment facilities involved, the discharge monitoring reports, the National Pollution Discharge Elimination System (NPDES) permits, and various related correspondence. He estimated that the new Greene Valley sewage treatment plant would begin accepting sewage from the Woodridge plant in September of 1983. Huff testified that during start-up of such a plant, it normally runs at about 25% of capacity. If the Greene Valley plant was started up in this manner, it would initially accept 1.5 million gallons of sewage per day or 15,000 PE. Under these circumstances, the loading on the Woodridge plant would be reduced, and the overall effluent quality of the Lisle and Woodridge plants would be improved. Huff stated that during the start-up of the Greene Valley plant, if it processed sewage at 25% of capacity during that time, "the introduction of a fraction [sic] of the [2,400 PE from Hobson Greene Unit Two] would not be detrimental—the effluent quality would be better still than it would have been historically." He said it "would not result in any change in the effluent quality. It would be better than what is currently being discharged by the Woodridge facility."

Huff stated that the county was planning to close down the Lisle plant when Greene Valley became fully operational. At this time the Woodridge and Greene Valley plants should have capacity to treat 100,000 PE. Huff stated that data for 1982 indicated that the total sewage flow in the area was 77,450 PE, and that there would, therefore, be sufficient capacity to treat the 2,392 PE from Hobson Greene Unit Two with no effect on effluent quality.

Huff testified that the county had included the 2,392 PE attributable to Unit Two in the design capacity of the Greene Valley plant. He

testified that once the Greene Valley plant was fully operational, and the Lisle plant was shut down, there would be capacity to treat 1,600 PE of sewage in addition to that currently being treated, and that which could be treated under an order entered by the circuit court of Du Page County in related litigation. Huff stated that the 2,392 PE attributable to Unit Two was part of the sewage which could be treated under that court order.

Following the hearing the parties submitted briefs, and on December 15, 1983, the Board, by a vote of 7-0, entered an order denying the requested variance for two reasons. The first was that the permit was originally issued to Unity, the corporation, which ceased to exist on June 21, 1979. The Board concluded that, because of the condition of the permit prohibiting its transfer without a new permit from the Agency, the permit expired on that date, or more than a year before the variance petition was filed. The order stated:

"The Board wishes to note that this is not, in its opinion, an issue in which form is elevated over substance. As afore-mentioned, the badly-overloaded Lisle-Woodridge plant was placed on restricted status May 31, 1979. Based on imposition of restricted status, the Board questions whether the Agency would have had legal authority on June 1, 1979 to issue, or to transfer from one 'Unity' to the other, the 'new' permit specified by [the condition of the permit] absent prior grant of a variance by the Board from 35 Ill. Adm. Code 309.241."

The second basis for the Board's order was that Unity had failed to prove that it would suffer an "arbitrary or unreasonable hardship" if the variance were not granted, as required by section 35 of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1035). The Board acknowledged Unity's argument that it was not required to prove hardship because the evidence showed that granting the variance would result in no environmental effect, but the Board concluded:

"[T]he Lisle-Woodridge plants have been unable to meet effluent standards, even given their improved performance in the past two years. As the Agency suggests, the Green [*sic*] Valley system can be expected to have an inconsistent performance while the usual, initial 'debugging' process occurs. The system is still on restricted status, and will doubtless remain so until both the Woodridge and Green Valley plants are operating properly. Unity has therefore proven that a less adverse environmental effect would occur by a connection after Green Valley is operational than before, but not that none will occur.

Hardship therefore must be proven."

The Board subsequently denied Unity's motion for reconsideration, and Unity filed its timely petition for review in this court.

■ We will first consider the motion of the Agency and the county to dismiss this petition for review on grounds of mootness. Attached to the motion was a copy of a letter from the Agency to the DCDPW notifying the latter that restricted status of the sewage treatment plants involved would be lifted May 15, 1984, because of the completion of the Greene Valley plant, and the demonstration of sufficient sewage treatment capacity to assure compliance with applicable effluent standards. Also attached to the motion was an affidavit of Thomas McSwiggin, manager of the permit section of the Agency's Division of Water Pollution Control, which stated that, as of the date the motion to dismiss was filed, the Woodridge and Greene Valley plants had capacity to treat 9,500 PE of sewage in addition to that currently being treated and that for which permits had been issued and applications for permits had been filed. The motion alleged that the petition for review was moot because Unity no longer needed a variance to extend the life of its old permit. Since there was sufficient sewage treatment capacity to treat the 2,392 PE from Unit Two, all Unity had to do was apply for a new permit. Unity opposed the motion to dismiss. It maintained that its petition for review was not moot because Unity had no assurance that if it applied, it would be granted a new permit. Unity argued that any new permit it might be issued might not be "equivalent in all of its aspects" to the permit involved in the instant case. Finally, Unity maintained that even if a new and equivalent permit was assured, the case would not be moot because of the expense involved in applying for a new permit.

Ordinarily, a reviewing court is restricted to the record of the trial court. (*People ex rel. Coats v. Sain* (1962), 24 Ill. 2d 248, 181 N.E.2d 179.) The same rule applies to the review of orders of administrative agencies. (Ill. Rev. Stat. 1983, ch. 110, par. 3—110.) Matters *dehors* the record can be considered, however, insofar as they concern the question of mootness. (*La Salle National Bank v. City of Chicago* (1954), 3 Ill. 2d 375, 379, 121 N.E.2d 486.) The reason for that exception to the rule is that the existence of a real controversy is an essential requisite to appellate jurisdiction, and courts allow facts which affect their right and duty to proceed in the exercise of such jurisdiction, but which do not appear in the record before it, to be shown by extrinsic evidence. (3 Ill. 2d 375, 379.) The material attached to the motion of the Agency and the county to dismiss the petition for review, which is *dehors* the record of the Board, will there-

fore be considered by this court, but only on the question of mootness.

■ In *La Salle National Bank,* our supreme court defined mootness as follows:

> "A case is moot when it does not involve any actual controversy. [Citation.] Where the issues involved in the trial court no longer exist, an appellate court will not review a case merely to decide moot or abstract questions, to establish a precedent, or to determine the right to, or the liability for, costs, or, in effect, to render a judgment to guide potential future litigation." (3 Ill. 2d 375, 378-79.)

In the instant case more is at stake than court costs. As Unity argues, the expenses it would have to incur in a new permit application proceeding are at stake. Unity maintains that it should not have to reapply, whereas the Agency and the county contend that it should. This difference between the parties is sufficient to create an actual controversy, and we need not consider Unity's arguments concerning the possibility that a new permit application might not yield a new and equivalent permit. This case is not moot, and the motion of the Agency and the county to dismiss Unity's petition for review is, therefore, denied.

■ We next consider whether the Board's decision was contrary to the manifest weight of the evidence. As noted above, the Board denied the variance for two reasons, *viz.,* (1) because the permit expired before the petition for variance was filed when the original permittee, Unity, the corporation, ceased to exist, and (2) because Unity had not proved that it would suffer an "arbitrary or unreasonable hardship" if the variance was denied. We need not discuss the first basis for the Board's order because, in our judgment, the second basis was a proper and sufficient reason for denial of the variance.

Section 35 of the Environmental Protection Act provides, in relevant part:

> "The Board may grant individual variances beyond the limitations prescribed in this Act, whenever it is found, upon presentation of adequate proof, that compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship." (Ill. Rev. Stat. 1983, ch. 111½, par. 1035.)

The burden of proving arbitrary or unreasonable hardship is on the party seeking the variance. (Ill. Rev. Stat. 1983, ch. 111½, par. 1037.) The petitioner must establish that the hardship resulting from a denial of the variance would outweigh the injury of the public from a grant of the petition. (*Caterpillar Tractor Co. v. Pollution Control*

*Board* (1977), 48 Ill. App. 3d 655, 363 N.E.2d 419.) The Board's finding on such questions of fact are held to be *prima facie* true and correct (Ill. Rev. Stat. 1983, ch. 110, par. 3—110) and may not be reversed unless they are against the manifest weight of the evidence. *Philipsborn Equities, Inc. v. Pollution Control Board* (1981), 94 Ill. App. 3d 1055, 419 N.E.2d 470.

Unity argues that the evidence is uncontradicted that to grant its requested variance would result in no environmental harm. It relies on Huff's testimony that during the start-up of the Greene Valley plant, the introduction of the 2,392 PE of sewage from Hobson Greene Unit Two "would not result in any change in the effluent quality. It would be better than what is currently being discharged by the Woodridge facility." This testimony must, however, be evaluated in light of the fact, acknowledged in Unity's amended petition for variance, that the Woodridge facility had been placed on restricted status by the Agency because it was not providing adequate sewage treatment. Unity also cites Huff's testimony that the Greene Valley plant was scheduled to start up in September of 1983, and that said facility was being constructed so as to accommodate the flow of sewage from Unit Two. Finally, Unity argues that balanced against no environmental harm, there would be a hardship to Unity from a denial of the variance in that Unity would have to apply for a new permit with no assurance that one would be granted.

The instant case is remarkably similar to *Philipsborn Equities, Inc. v. Pollution Control Board* (1981), 94 Ill. App. 3d 1055, 419 N.E.2d 470. In that case the developer obtained sewer construction and operation permits from the Agency, which, like those in the instant case, were conditioned on completion of the construction in two years. Because of adverse economic conditions the developer did not complete construction of the sewer by the deadline, and the permits expired. Sometime later the sewage treatment facility involved was placed on restricted status because it was discharging legally impermissible concentrations of contaminants. Problems also developed involving the sanitary collection system. The developer subsequently sought a variance to enable it to construct and operate sewer connections to service 60 apartments. The Board granted the request with respect to four model apartments, but with respect to the remaining units the Board authorized "construction only" permits. The Board refused the developer's request that the variance authorize operating permits for those units conditioned upon the completion of improvements in the sewage treatment facilities.

On appeal the developer argued that the Board's order was con-

trary to the manifest weight of the evidence. Like Unity, it argued that it had presented uncontradicted evidence that when the improvements in the sewage collection and treatment facilities were completed, the sewage from the development could be safely and adequately treated. The developer also maintained that denial of the variance would result in an arbitrary and unreasonable hardship in that, when the new facilities were completed, the developer would have to bear the costs and delay of another variance proceeding. The appellate court rejected these arguments, stating:

"We do not believe it was against the manifest weight of the evidence for the Board to refuse Philipsborn's request that the permits issue automatically upon the completion of the proposed Barrington Improvements. The proposed improvements may ultimately prove to be inadequate. Although improvements to treat and transport raw sewage may seem adequate in theory at the time proposed, such improvements may prove deficient once implemented. (See *Springfield Marine Bank v. Pollution Control Board* (1975), 27 Ill. App. 3d 582, 327 N.E.2d 486.) Thus, any hardship to the petitioner cannot be viewed as unreasonable and arbitrary." *Philipsborn Equities, Inc. v. Pollution Control Board* (1981), 94 Ill. App. 3d 1055, 1058.

In the instant case, as in *Philipsborn Equities*, the developer's evidence on the question of environmental effect was conditioned on the assumption that the new sewage treatment facilities would operate as efficiently as they were supposed to. As in *Philipsborn Equities*, the only real hardship shown was the cost and delay involved in further proceedings to obtain a new permit. As in *Philipsborn Equities*, we cannot fault the Board for taking a "wait-and-see" approach with respect to the new sewage treatment facilities. The Board's denial of the variance was not contrary to the manifest weight of the evidence.

■ We finally consider Unity's argument that the Board erred by imposing the sanctions against it for violation of prehearing discovery rules. The parties agree that the Board has authority under its rules to impose the type of sanctions involved here where a party unreasonably refuses to comply with discovery rules or an order entered thereunder, and they agree that review of the Board's decisions regarding such sanctions should be governed by the same principles as review of a trial court's imposition of sanctions under our Supreme Court Rules.

Under those rules a trial court, in determining which sanction to impose, must seek to accomplish discovery, rather than to inflict punishment. (*Jones v. Healy* (1981), 97 Ill. App. 3d 255, 422 N.E.2d 904.) On the other hand, it is appropriate for the trial court to consider the

need to use sanctions as a general deterrent in order to provide a strong incentive for all litigants to comply with discovery rules. (*Perimeter Exhibits, Ltd. v. Glenbard Molded Binder, Inc.* (1984), 122 Ill. App. 3d 504, 461 N.E.2d 44.) The imposition of sanctions is generally a matter within the discretion of the trial court, and its decision will not be reversed in the absence of an abuse of discretion. (*Fine Arts Distributors v. Hilton Hotel Corp.* (1980), 89 Ill. App. 3d 881, 412 N.E.2d 608.) The sanction of dismissal, however, should be invoked only in those cases where the actions of a party show a deliberate, contumacious, or unwarranted disregard of the court's authority. *Jones v. Healy* (1981), 97 Ill. App. 3d 255, 422 N.E.2d 904.

Unity maintains that the sanctions imposed were so severe that the rule relating to dismissal should apply, *i.e.*, the sanctions should only be upheld if Unity's actions showed a deliberate, contumacious, or unwarranted disregard of the Board's authority. Unity argues that such a conclusion cannot be drawn because the record does not support even the Board's finding that Unity was guilty of dilatory conduct. The Board, Unity notes, entered only one order compelling it to answer the Agency's discovery requests, and Unity did not receive that order until one day before compliance was due. Unity maintains that the hearing officer had "perfunctorily" granted its previous requests for extension of time. Finally, Unity contends that its delay caused no prejudice, and that there was no reason to continue the sanctions after it amended its petition.

Initially, we note that the Board did not dismiss Unity's petition for variance. Unity was afforded an evidentiary hearing, and, in fact, as discussed above, has argued in this court that it was able to present sufficient evidence at that hearing to require a decision in its favor. What the Board did was to prohibit Unity from introducing evidence concerning the issues on which it had failed to provide discovery. We are aware of no authority, and Unity has cited none, to the effect that the standards relating to the sanction of dismissal are applicable under these circumstances.

■ Moreover, we believe the Board's finding that Unity was guilty of dilatory conduct was amply justified. Unity filed a total of five motions for extension of time before the Board on October 5, 1982, ordered it to respond to the outstanding discovery requests. In its third motion filed two months earlier Unity had stated that it was "in the process of responding" to the requests. Yet, when ordered to respond, Unity filed motions to strike the requests, one motion directed to the interrogatories, and the other to the request for production of documents. Each motion contained less than a page of text.

They set forth the general objections that the discovery requests were too burdensome, would not lead to relevant evidence, and concerned information which the Agency could obtain by unspecified "alternative means." These documents did not take two months to prepare. Moreover, without reiterating the substance of the Agency's discovery requests here, we will note our conclusion that the broad objections Unity interposed were frivolous. It is true that Unity did not receive the Board's order overruling those objections and requiring answers until one day before the answers were due. Unity, however, filed nothing for 13 days after receipt of the order, and then it did not file the answers, but rather a motion for reconsideration of the order requiring answers, or, in the alternative, for yet another extension of time. The Board did not impose sanctions until the following day. Under the circumstances, we believe the Board was justified in concluding that Unity unreasonably refused to comply with discovery and, therefore, in imposing sanctions. Moreover, the particular sanctions imposed, exclusion of evidence on the issues for which discovery had been sought, were appropriate. See *Allaert Rendering, Inc. v. Pollution Control Board* (1980), 91 Ill. App. 3d 160, 414 N.E.2d 497.

Finally, we agree with the Board that Unity's amendment of its variance petition was irrelevant to this issue. The amendment changed only the duration of time sought for the construction permit, and provided information about the Greene Valley plant. It did not substantially change the issues in the case involved in the Agency's discovery requests.

For the foregoing reasons, we affirm the order of the Pollution Control Board denying the petition for variance.

Affirmed.

LINDBERG and UNVERZAGT, JJ., concur.